DIF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ROY VAN ALLEN,

                    Plaintiff,

        -against-

NEW YORK CITY SCHOOL CONSTRUCTION
AUTHORITY, SHARON GREENBERGER, and
LORRAINE GRILLO, in their individual and official
capacities,

                    Defendants.
----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**17-CV-2176 (NGG) (VMS)**

Plaintiff Roy Van Allen, a technical inspector at Defendant New York City School

Construction Authority (the "SCA"), brings this action against the SCA, Sharon Greenberger and

Lorraine Grillo,[1] alleging that—after Plaintiff warned Defendants of hazardous conditions at a

public school—Defendants retaliated against him in violation of the First and Fourteenth

Amendments of the United States Constitution; New York State Human Rights Law, N.Y. Exec.

Law § 296; and New York City Human Rights Law, N.Y.C. Admin. Code § 8-107. (Am.

Compl. (Dkt. 19) ¶¶ 80-113.) Defendants now move to dismiss Plaintiff's Amended Complaint

pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief. (Mot. to Dismiss (Dkt.

22)); (Mem. in Support of Mot. to Dismiss ("Def. Mem.") (Dkt. 23).) In his response to

Defendants' motion, Plaintiff forfeited all of his claims except for his First Amendment

retaliation claim brought under 42 U.S.C. § 1983. (Mem. in Opp'n to Mot. to Dismiss ("Pl.

---

[1] Defendant Grillo is named in this action as "Lorrane" Grillo. Defendants have informed the court that her name is, in fact, "Lorraine" Grillo. (See Def. Mot. for Extension of Time to File Answer (Dkt. 10) at 1.)

Opp'n") (Dkt. 24) at 17.) For the reasons that follow, Defendants' motion to dismiss is
GRANTED.

## I.  BACKGROUND

### A.  Factual Allegations

The court takes the following statement of facts largely from the Amended Complaint,
the well-pleaded factual allegations of which are accepted as true for the purposes of deciding
Defendants' motion. See N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir.
2017), cert. denied sub nom., 138 S. Ct. 131 (2017).

Plaintiff has worked as a technical inspector for the SCA since 2000. (Am. Compl. ¶¶ 7,
12.) The SCA is a public entity responsible for overseeing construction and renovation projects
for public schools in New York City. (Id. ¶ 8.) From 2000 to 2009, Plaintiff inspected plumbing
systems in schools. (Id. ¶¶ 7, 11-12.) In 2003, the SCA authorized him to "sign off on
plumbing, fire suppression, fuel burning, and fuel storage inspections"—responsibilities that are
"only given to licensed and experienced inspectors." (Id. ¶ 15.) In 2008, he received a
permanent appointment from the civil service list and was assigned to the SCA's Construction
Inspection Department ("CID"). (Id. ¶ 17.)

During this period, Plaintiff also contributed to a number of training and development
programs for inspectors at the SCA. In 2001, Plaintiff "helped create the Handbook for
Plumbing [I]nspections at SCA." (Id. ¶ 13.) From 2002 to 2006, he "conducted seminars for
[p]lumbing inspections for SCA employees." (Id. ¶ 14.) He also "helped with the creation of the
test and job description for the position of 'Technical Inspector for Plumbing.'" (Id. ¶ 16.)

Plaintiff's standing at the SCA changed dramatically on January 5, 2009. On that day,
Plaintiff was inspecting a school named P.S. 125 M when he "uncovered major construction

2

problems with the [school's] fire sprinkler system." (Id. ¶¶ 18-19.) Plaintiff immediately attempted to alert his supervisors of what he had found. First, he called two of his supervisors, Robert Machado and Vinicius Castagnola, but neither answered. (Id. ¶ 19.) Plaintiff then called another supervisor, Marty Robholz, who told Plaintiff to write a report on what he found. (Id.) Plaintiff wrote a report, which stated that the school "[f]ailed" its inspection. (Id.) Plaintiff then emailed the same supervisors two additional times to reiterate that P.S. 125 M was a "wreck" and repeatedly warned that a building occupied by children should be safer. (Id. ¶¶ 19-21.) The project manager and contractor for the school subsequently "addressed" the problem at an unspecified time. (Id. ¶ 20.)

In the ensuing days, Plaintiff continued relaying his concerns about P.S. 125 M to his supervisors and senior leadership at the SCA. (Id. ¶¶ 22-24.) On January 7, 2009, Plaintiff "met with Marty Rebhotz to discuss [Plaintiff's] email and [Rebhotz] directed Plaintiff to write his report with all the code violations."[2] (Id. ¶ 22.) Plaintiff also emailed other individuals in the CID to complain of unspecified "retaliation for warning IG and his superiors of dangerous plumbing situations at the various schools, lack of oversight, dangers to the children and mismanagement."[3] (Id. ¶ 23.) On January 8, 2009, Plaintiff emailed Defendant Sharon Greenberger, the President and Chief Executive Officer of the SCA at the time, "to inform her that the contractors have been altering the Fire Stand Pipe System and Fire Sprinklers without a site safety plan" and warned that P.S. 125 M "was occupied by children." (Id. ¶¶ 9, 24.)

---

[2] The Amended Complaint is unclear as to whether Marty Robholz and Marty Rebhotz are different individuals.

[3] Plaintiff identifies the recipients of this email as Zygmunt Jagiello, Joseph Miraglia, and Sherif Khamel. Khamel is a technical inspector, like Plaintiff. (See Am. Compl. ¶ 26.) Plaintiff has not explained his relationship with Jagiello or Miraglia. Further, Plaintiff has not specified who "IG" is in this allegation. The court assumes that he is referring to the Office of Inspector General for the SCA, who requested a meeting with the Plaintiff on February 2, 2009. (See id. ¶ 33.) Plaintiff also does not specify the other "various schools" mentioned in this allegation, as the Amended Complaint only references P.S. 125 M.

On the same day that Plaintiff emailed Defendant Greenberger, SCA officials called a meeting with all inspectors to "tell[] the inspectors to be cooperative with the project management of SCA." (Id. ¶ 25.) In the meeting, Plaintiff and another inspector, Sherif Khamel, "spoke out and questioned" SCA's request that inspectors be more cooperative with project management. (Id. ¶ 26.)

That night, Robert Machado called Plaintiff to tell him that "he is going to be reassigned by Sharon Greenberger." (Id. ¶ 27.) In a meeting the next day with his supervisors and representatives from SCA's human resources office, Plaintiff was told that he was being reassigned to the SCA's Construction Management Division ("CMD") effective on January 12, 2009. (Id. ¶ 28.) Khamel was also reassigned, (id. ¶ 31), but Plaintiff does not specify the nature of Khamel's new assignment. "Soon after the meeting" in which Plaintiff was reassigned, Robert Machado emailed other inspectors to tell them "he was against the reassignment of Plaintiff, but he could not override the President of the [SCA]." (Id. ¶ 30.) In 2010, the CID replaced Plaintiff with two individuals hired from outside the civil service list, contrary to the SCA's contract with its union and a mayoral-imposed hiring freeze.[4] (Id. ¶¶ 46, 58.)

Plaintiff now enjoys far fewer benefits and substantive responsibilities at the CMD than at his previous role at the CID. First, Plaintiff no longer receives overtime pay, a loss of approximately $40,000 to $50,000 a year. (Id. ¶ 32.) Second, Plaintiff "no longer receives any substantial assignments or is given any substantial responsibilities." (Id.) Plaintiff conducts "constructability review work for line projects, reviews contract drawings and drafts questions

---

[4] Plaintiff alleges that these inspectors were hired to replace him and another inspector, Pablo Torres, after "they were forced out of the Plumbing Inspection unit by SCA management when they spoke-up at the general meeting earlier that year." (Am. Compl. ¶ 46.) The court is unclear as to whether this meeting was the one in which Plaintiff and Sherif Khamel spoke out against cooperating with project management. (See id. ¶¶ 25-26.)

and concerns as a result of his review." (Id.) This entails "read[ing] contract plans [and] specifications with no real responsibilities." (Id. ¶ 76.)

After his reassignment, Plaintiff began publicizing his concerns about the safety of New York City public schools. At an unspecified time after February 2, 2009, Plaintiff met with the SCA's Inspector General "to discuss his concerns and complaints." (Id. ¶ 33.) In April 2009, the New York Daily News interviewed and named Plaintiff in two stories about "local building code violations that posed significant health and safety risks." (Id. ¶ 34.) In June 2009, the Commissioner of the New York City Department of Investigations was informed of the Plaintiff's complaints about "local building code violations" and told the Plaintiff that his complaints were "a serious public safety concern." (Id. ¶¶ 36-37.)

Later in 2009, Plaintiff began expressing his concerns about school safety to elected officials. He sent letters to the New York County District Attorney's Office in June 2009 and a New York State Senator and the New York State Attorney General in July 2009. (Id. ¶¶ 35, 41-42.) Each of these letters complained of "local building code violations that posed significant health and safety risks" and claimed that the SCA was misusing public funds. (Id. ¶ 42.) In September 2009, a deputy counsel in the SCA's inspector general's office "was informed" of Plaintiff's complaints about building code violations, faulty infrastructure, and mishandled public funds. (Id. ¶ 44.)

In November 2009, Plaintiff's union filed a grievance with the SCA on Plaintiff's behalf, arguing that Plaintiff was being made to work outside of his civil-service title in his new position at the CMD even though SCA needed more inspectors. (Id. at 46.) An arbitrator ruled against Plaintiff on this matter in August 2010, finding that Plaintiff was working within his title. (Id. ¶ 49.)

Plaintiff makes no allegations about his circumstances at the SCA between his adverse arbitration outcome in August 2010 and December 2013. During this period, Defendant Lorraine Grillo replaced Defendant Greenberger as President and Chief Executive Officer of the SCA in 2013. (Id. ¶ 10.)

From December 2013 to March 2017, Plaintiff applied for numerous technical inspector positions in the SCA, often at the behest of his former supervisors in the CID—including those he complained to in January 2009. (Id. ¶¶ 50-73). Each time, however, Plaintiff was rejected in favor of less-qualified applicants. (Id. ¶ 29.) The successful applicants included individuals who were either hired from outside of the civil service (id. ¶ 58) or lacked a fire suppression license and had faced prior reprimand. (Id. ¶ 52.)

After over a dozen rejected applications, Plaintiff contacted human resources at the SCA for an explanation. The office initially informed Plaintiff that he was not qualified for one of the inspector positions, (id. ¶ 61), but subsequently told him that their office simply vets and forwards "qualified resume[s]" to the SCA's hiring division and "do[es] not get involved in the interview process." (Id. ¶ 67.) Plaintiff later asked for a copy of his personnel file, which showed that his work evaluations "have always been above average" and that some of his evaluations indicated that he "exceed[ed] expectations." (Id. ¶ 75.)

B.     Procedural History

Plaintiff initiated this action on April 10, 2017, against the SCA, Greenberger, and Grillo, seeking five million dollars in compensatory damages, two million dollars in punitive damages against the individual defendants, and unspecified declaratory relief. (Compl. (Dkt. 1)); (Am. Compl. ¶¶ 1, 8-10, 94).) Plaintiff filed his Amended Complaint on August 4, 2017. (Am. Compl.) He asserts § 1983 claims for retaliation in violation of the First Amendment and the

Equal Protection Clause of the Fourteenth Amendment, as well as retaliation and hostile-work-environment claims pursuant to New York State Executive Law § 296 and New York City Administrative Code § 8-107. (Id. ¶ 80-113.)

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the Amended Complaint must present sufficient facts that, when accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Accordingly, for the purposes of deciding Defendants' motion, the court "accept[s] all factual allegations in the [Amended Complaint] as true" and will "draw all reasonable inferences in [Plaintiff's] favor." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 429 (2d Cir. 2011) (citation and internal quotation marks omitted). The court is not, however, required to accept as true allegations that amount to "legal conclusions couched as a factual allegation" or "naked assertion[s] devoid of further factual enhancement." See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint falls short of this standard when its well-pleaded factual allegations are "merely consistent with" or suggest the "possibility" that a defendant is liable. Id. (internal citation and quotation marks omitted). A plaintiff must therefore plead sufficient factual content to "nudge[]" their claim "across the line from conceivable to plausible." Id. at 680 (quoting Twombly, 550 U.S. at 570).

## III.   DISCUSSION

Defendants make three arguments in support of dismissal. First, Defendants argue that each alleged adverse employment action that Plaintiff suffered was a discrete, individually

actionable event, and any adverse action that occurred before April 10, 2014, cannot be the basis

of Plaintiff's claim because of the three-year statute of limitations for § 1983 claims. Second,

Defendants argue that Plaintiff fails to plausibly allege a causal connection between any

instances of retaliation that took place after April 10, 2014, and conduct protected by the First

Amendment. Third, Defendants argue that Plaintiff fails to plausibly allege that Greenberger and

Grillo were personally involved in the retaliation to an extent justifying liability, and that

Plaintiff fails to plausibly allege that there is a policy or custom at the SCA sufficient to hold a

public entity liable under Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658 (1978).

     The court agrees with all three of Defendants' arguments. As an initial matter, the court

finds that Plaintiff's retaliation claim is timely only with respect to the SCA's rejections of

Plaintiff's job applications after April 10, 2014, and not with respect to any adverse employment

actions he suffered prior to that date. The court further finds that Plaintiff fails to state a

plausible claim for relief based on those rejections because of Defendants' other two arguments.

First, Plaintiff fails to plausibly allege that the rejections were caused by his protected speech as

a private citizen, rather than his unprotected speech as a public employee. Second, Plaintiff fails

to plausibly allege that the named Defendants were sufficiently involved in the retaliatory

conduct. Specifically, he has not pleaded sufficient factual content to allow the court to infer that

the individual defendants were personally involved in the timely acts of retaliation against him or

that the SCA is liable for causing these acts due to a policy or custom of retaliation against

whistle-blowers at the agency.

### A.    Statute of Limitations for § 1983 Claims

     The court finds that each alleged instance of retaliation against the Plaintiff constituted a

discrete and individually actionable event. As a result, Plaintiff's retaliation claim is timely only

with respect to the retaliatory acts that occurred after April 10, 2014. While the retaliatory acts that occurred prior to this date are untimely, they are still relevant to the extent that they provide context to support Plaintiff's timely claims of retaliation.

1.    Legal Framework

Retaliation claims brought under § 1983 have a three-year statute of limitations. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015). Because Plaintiff initiated this action on April 10, 2017, only the retaliatory acts that accrued after April 10, 2014, are timely. See Wallace v. Kato, 549 U.S. 384, 388 (2007) ("[A]ccrual [for a § 1983 claim] occurs when the plaintiff has a complete and present cause of action." (internal citation and quotation marks omitted)). The parties dispute whether the adverse event Plaintiff suffered in 2009 and the ones he suffered after April 10, 2014, may be considered as part of one claim or as separate claims that began accruing once the adverse action occurred.

Defendants argue that Plaintiff alleges discrete acts of retaliation, rather than an ongoing custom or policy of retaliation. (See Def. Mem. at 7.) This would mean that each retaliatory act against the Plaintiff—such as his initial reassignment to the CMD and each of his subsequently rejected job applications—became actionable on the day it occurred, causing the three-year limitation period to begin running for that act as well. (Def. Mem. at 7-8.) See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002). Defendants thus concede that the retaliatory acts that occurred after April 10, 2014—which includes most of Plaintiff's rejected job applications—are actionable in support of Plaintiff's claim. But Defendants' argument would exclude from Plaintiff's claim his initial reassignment to the CMD and the undesirable work and benefits it entailed.

9

In response, Plaintiff argues that all of his allegations of retaliation are timely because the events he suffered constituted an ongoing pattern of harassment. (See Pl. Opp'n at 11-12.) According to Plaintiff, because some of the events in this continuing stream of retaliation took place within the three-year limitation period, all of the adverse actions he suffered as a result of his reports —even the ones that occurred prior to April 10, 2014—are actionable. (Id. at 12 ("Provided that an act contributing to [a hostile work environment] claim occurs within the filing period, the entire time period of the hostile work environment may be considered for the purposes of determining liability." (quoting Morgan, 536 U.S. at 117)).)

2.    Application

The court rejects Plaintiff's attempt to circumvent the statute of limitations and finds that his allegations present discrete acts of retaliation, not an ongoing practice. These discrete acts of retaliation consist of (1) Plaintiff's initial reassignment to the CMD, effective January 12, 2009, (Am. Compl. ¶ 28); (2) his loss of overtime pay and receipt of undesirable assignments starting on the date he started his new position, (id. ¶ 32); and (3) each of the instances where the SCA rejected Plaintiff's application for technical inspector positions between April 2014 and March 2017. (Id. ¶¶ 52-73.). All of these retaliatory events are readily identifiable and became "individually actionable" on the day that they occurred. See Birch v. City of N.Y., 675 F. App'x 43, 44-45 (2d Cir. 2017) (rejecting the plaintiff's continuing-violation theory because "the complaint is based primarily on a series of discrete alleged retaliatory events such as punitive transfers, undesirable assignments . . . ."); Kazolias v. IBEWLU 363, 806 F.3d 45, 53 (2d Cir. 2015) (finding that each wrongfully withheld job referral was individually actionable and rejecting the plaintiff's continuing-violation theory). Discrete retaliatory acts "are not actionable

if time barred, even when they are related to acts alleged in timely filed charges." Birch, 675 F. App'x at 44-45 (quoting Morgan, 536 U.S. at 101).

Further, contrary to Plaintiff's conclusory characterizations, his allegations do not reflect the sort of "severe or pervasive" harassment necessary to support a hostile work environment claim. See Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001). Plaintiff's allegations are not about his work "environment[]." He does not, for instance, allege that he faced harassment from "different individuals over considerable periods of time" or harassment that "alter[ed] his work environment on a day-to-day basis." See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (finding hostile work environment "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive" (citation and internal quotation marks omitted)); see also Davis-Molinia v. Port Auth. of N.Y. & N.J., No. 08-CV-7584 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding Plaintiff's allegations of diminished responsibilities, exclusion from staff meetings, rude interactions, and an increased workload of menial tasks did not reflect severe or pervasive harassment sufficient to allege a hostile work environment), aff'd, 488 F. App'x 530 (2d Cir. 2012). Instead, Plaintiff faced discrete adverse actions that occurred sporadically over eight years.

Finally, the court does not find any compelling basis for indulging Plaintiff's attempt to invoke the continuing violation doctrine. See Crosland v. City of N.Y., 140 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), aff'd sub nom. 54 F. App'x 504 ("The courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances." (internal quotation marks omitted)). Since Plaintiff's allegations present at least some timely instances of retaliation, his retaliation claim does not face the same challenges as most claims that must rely on a continuing violation theory. See McGullam v.

11

Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) ("[H]ostile work environment claims are different in kind from discrete acts" because they "involve[] repeated conduct" and "cannot be said to occur on any particular day." (internal citation and quotation marks omitted)). Plaintiff's circumstances therefore fail to justify invoking the continuing violation doctrine.

Accordingly, Plaintiff's claim is timely only with respect to the denials of his job applications that took place after April 10, 2014. Plaintiff's reassignment to the CMD, loss of overtime pay, and receipt of undesirable assignments prior to April 10, 2014, are untimely.[5] However, while these untimely acts are not actionable in their own right, they may still serve as relevant "background evidence" to inform the court's assessment of the timely allegations. Morgan, 536 U.S. at 113 ("Nor does the statute [of limitations] bar an employee from using the prior acts as background evidence in support of a timely claim."); Vega, 801 F.3d at 88 (finding that the plaintiff's time-barred allegations of discrimination could "provide 'relevant background evidence' by shedding light on [the defendant's] motivation . . .") (citation omitted).

B. **Whether Plaintiff Has Stated a First Amendment Claim**

To state a claim of First Amendment retaliation, Plaintiff must plausibly allege that "(1) his speech or conduct was protected by the First Amendment; (2) [D]efendant[s] took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." Montero v. City of Yonkers, 890 F.3d 386, 394 (2d Cir. 2018) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)). Plaintiff has failed to meet this standard because only some of the speech described in his Amended Complaint is

---

[5] The court rejects, to the extent Plaintiff attempts to make this argument, that Plaintiff's retaliation claim includes "not do[ing] any inspections per his title." (Am. Compl. ¶ 76.) Plaintiff acknowledges that an arbitrator has already ruled that Plaintiff is working within his title. (Id. ¶¶ 46, 49.) As Defendants point out, Plaintiff has not brought any application to vacate or modify this judgment under New York State law. (Def. Mem. at 8 n.2.) In any event, the court finds that this allegation constitutes a discrete act of retaliation and is therefore untimely.

protected by the First Amendment, and he has not alleged facts demonstrating a causal connection between his protected speech and the adverse actions he suffered after April 10, 2014.

### 1.   Protected Speech

The SCA concedes that Plaintiff's complaints to the New York Daily News and several elected officials outside the SCA between April 2009 and July 2009 were protected by the First Amendment. (Def. Mem. at 10.) The SCA instead argues that Plaintiff's earlier complaints to SCA officials in January 2009 were not protected speech. (Id. at 9-10.)

For a public employee's speech to be protected by the First Amendment, the employee must be speaking as a citizen on a matter of public concern, rather than speaking pursuant to her official duties. Garcetti v. Ceballos, 547 U.S. 410, 418-20 (2006). If the employee "either did not speak as a citizen or did not speak on a matter of public concern," the speech is not protected. Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (citation omitted).

### a.   *Whether Plaintiff Spoke as a Citizen Prior to April 2009*

The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether 'the speech fall[s] outside of the employee's 'official responsibilities,'" and (2) whether 'a civilian analogue [(i.e., a form or channel of discourse available to non-employee citizens)] exist[s].'" Montero, 890 F.3d at 397 (first and third alterations in original) (quoting Matthews v. City of New York, 779 F.3d 167, 173 (2d Cir. 2015)). While the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive; the first inquiry is the critical one. Id. at 397-98. Plaintiff's January 2009 reports to SCA officials fell within his official responsibilities. His duties as a technical inspector included inspecting schools for defects in their plumbing and fire safety

infrastructure. (See Am. Compl. ¶ 15.) Plaintiff was assigned to inspect P.S. 125 M when he uncovered the alleged defects and code violations that became the subject of his complaints to his supervisors. (Id. ¶¶ 18-19.) Plaintiff was thus "perform[ing] the task that he was paid to perform" as an inspector when he reported his findings to his supervisors through internal processes—including phone calls, emails, and meetings. Garcetti, 547 U.S. at 422.

Moreover, after Plaintiff complained, his supervisors told him to write a report on what he found—further reflecting that his conduct was within the scope of his duties. Similarly, Plaintiff acted pursuant to his duties when he complained to more senior officials at the SCA, including Defendant Greenberger. See Ross v. Breslin, 693 F.3d 300, 307 (2d Cir. 2012) ("Taking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform . . . speech into protected speech made as a private citizen.'") (quoting Anemone v. Metro. Transp. Auth., 629 F.3d 97, 116 (2d Cir. 2011)); cf. Montero, 890 F.3d at 397 (indicating that if an individual's speech was pursuant to his official duties, he was speaking as an employee, not a citizen). Plaintiff and Sherif Khamel's pushback against SCA leadership's request that they be more cooperative with project management was similarly "part and parcel of" their "concerns about [their] ability to properly execute [their] duties." Weintraub, 593 F.3d at 203 (citing Williams v. Dall. Indep. Sch. Dist., 480 F.3d 689, 694 (5th Cir. 2007)). Specifically, Plaintiff was expressing concern that the request for more cooperation was an attempt to deter him from reporting the findings of his inspections, which is part of his duties as an inspector.

Additionally, there is no civilian analogue for Plaintiff's reports prior to April 2009. Speech has a "'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" Matthews, 779 F.3d at 175 (quoting Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir.

14

2011)). Plaintiff's speech came in the form of reports and emails to his supervisors and comments at meetings with other inspectors and SCA leadership. Plaintiff has not shown that his supervisors and SCA leadership had an "open door to community comments and complaints" regarding plumbing issues or that ordinary civilians are "regularly provided the opportunity to raise issues with" his supervisors or SCA leadership. Id. at 176.

Accordingly, Plaintiff's reports prior to April 2009 were not citizen speech, and thus were unprotected by the First Amendment. They were the type of speech that the SCA, as a public employer, can limit for the sake of improving governmental performance—as Plaintiff's supervisors may have been attempting to do when they allegedly called a meeting to ask the inspectors to cooperate with "project management." (Id. ¶ 25.) See, e.g., Garcetti, 547 U.S. at 423 (finding that the defendant district attorney's office was permitted to "take proper corrective action" against a prosecutor if they found that his "memo was inflammatory or misguided" and "led to a heated meeting with employees from the sheriff's department"). Only Plaintiff's complaints to the New York Daily News and several elected officials outside the SCA between April 2009 and July 2009, and not any earlier comments, were protected by the First Amendment.

### 2. Adverse Employment Action

To state a First Amendment retaliation claim, Plaintiff must show that Defendants took an adverse employment action against him that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Wrobel v. County of Erie, 692 F.3d 22, 31 (2d Cir. 2012) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)). Such an adverse action may include "harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such

as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." Id. (quoting Zelnik, 464 F.3d at 225).

Defendants do not appear to dispute that Plaintiff's allegations of rejected job applications after April 2014 satisfy this element of his First Amendment claim. (Am. Compl. ¶¶ 50-73.) See Wrobel, 692 F.3d at 31; Zelnik, 464 F.3d at 225. As discussed above, however, any adverse actions that Plaintiff suffered before April 10, 2014, cannot be a basis for Plaintiff's claim because they took place outside of § 1983's statute of limitations.

       3.    Causal Connection

Plaintiff's claim ultimately fails because he has fallen short of plausibly alleging that the adverse actions he suffered within § 1983's limitation period were caused by his protected speech. The court cannot reasonably infer that the retaliation against the Plaintiff in 2014 and afterwards was the result of protected speech he engaged in five years earlier. On the contrary, several of Plaintiff's own allegations undercut this inference, as the court explains in more detail below.

       *a.*    *Legal Framework*

To satisfy the causation element of his First Amendment retaliation claim, Plaintiff must plausibly allege that his "protected speech was a substantial motivating factor in the adverse employment action[s]." Smith v. County of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015) (quoting Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ., 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." Id. (citing Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004)). Other types of

circumstantial evidence besides temporal proximity may also suffice for an indirect showing of causation. See Buttaro v. City of N.Y., No. 15-CV-5703 (ILG) (JO), 2017 WL 1906725, at *3 (E.D.N.Y. May 8, 2017); Tomlins v. Vill. Of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 376 n.22 (S.D.N.Y. 2011); Rolon v. Ward, No. 05-CV-0168 (WCC), 2008 WL 4700705, at *24 n.23 (S.D.N.Y. Oct. 24, 2008); c.f. Kane v. Krebser, 44 F. Supp. 2d 542, 547 (S.D.N.Y. 1999) ("Rarely can plaintiffs obtain documents or testimony wherein an employer specifically proclaims his or her desire to retaliate against an employee for engaging in protected speech."). For example, a plaintiff may indirectly show causation by demonstrating that they were subject to disparate treatment or a pattern of antagonism. See Tomlins, 812 F. Supp. 2d at 376 n.22 (finding a plaintiff successfully stated a claim for First Amendment retaliation after considering these factors).

> ### b. *Application*

Plaintiff does not present any direct allegations of Defendants exhibiting a retaliatory animus towards him as part of the timely acts of retaliation. He does allege that his initial reassignment to the CMD in January 2009 was at the direct order of Defendant Greenberger. (Am. Compl. ¶¶ 28, 30.) But this allegation cannot serve as direct evidence of retaliation on the basis of protected speech because Plaintiff's reassignment occurred prior to April 2009, the first time that he engaged in protected speech. In the absence of direct evidence, the court proceeds to consider whether Plaintiff has sufficiently alleged circumstantial facts to support an inference of causation based on temporal proximity, disparate treatment, or a pattern of antagonism.

> ### i. Temporal Proximity

A plaintiff can present an inference of retaliation by "showing that the protected activity was closely followed in time by the adverse . . . action." Nagle v. Marron, 663 F.3d 100, 110 (2d Cir. 2011) (citing Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252 F.3d 545,

554 (2d Cir. 2001)). The Second Circuit has refused to "draw[] a bright line to define the outer limit[]" of a sufficient temporal relationship. Gorman-Bakos, 252 F.3d at 554; see Burkybile v. Bd. of Educ., 411 F.3d 306, 314 (2d Cir. 2005); McDowell v. N. Shore-Long Island Jewish Health Sys., Inc., 788 F. Supp. 2d 78, 82 (E.D.N.Y. 2011). Courts in this circuit, however, routinely find that a period of more than two years between a plaintiff's protected speech and subsequent retaliation is insufficient to support an inference of retaliation. See Redd v. N.Y. State Div. of Parole, 923 F. Supp. 2d 371, 388 (E.D.N.Y. 2012) (collecting cases and finding that a period of twenty months or longer "suggests, by itself, no causality at all") (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001)).

Defendants argue that the five-year period between Plaintiff's last exercise of protected speech in July 2009 and the first subsequent act of retaliation in April 2014 is too long of a period to support an inference of retaliation. (Def. Mem. at 12-13.) The court agrees with Defendants. Five years is simply too long to give rise to any inference of causation. See Redd, 923 F. Supp. 2d at 388.

Plaintiff also appears to rely on the temporal proximity between his January 2009 complaints and immediate reassignment (which was outside of § 1983's limitation period, but can be background evidence for causation, see Vega, 801 F.3d at 88) to support a retaliatory motive. (Id. at 15.) Plaintiff's argument is unpersuasive. As explained above, Plaintiff's January 2009 reports were not protected speech. Plaintiff has not cited, and the court is not aware of, any authority indicating that temporal proximity between unprotected speech and an adverse action may show a causal connection between another instance of speech and another adverse action. On the contrary, courts in this circuit have suggested that the temporal proximity must be between the events that form the basis of a plaintiff's claim. See Smith, 776 F.3d at 118;

Cobb, 363 F.3d at 108. Thus, Defendants' adverse action against Plaintiff in January 2009 cannot support an inference of retaliation based on any protected speech.

In fact, as Defendants points out (Def. Mem. at 13 n.6), their adverse treatment of Plaintiff before and after he engaged in protected speech challenges any inference that Defendants acted with retaliatory motive when denying Plaintiff's job applications. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the Plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Additionally, the content of Plaintiff's protected speech was similar to his earlier unprotected complaints. Yet Plaintiff alleges that he faced immediate retaliation for the former, but not the latter. These circumstances do not warrant an inference of retaliatory motive. See Slattery, 248 F.3d at 95.

ii.     Disparate Treatment

Plaintiff alleges that less-qualified applicants were hired for technical inspector positions instead of him between April 2014 and March 2017. (Am. Compl. ¶¶ 50-73). Allegations that a plaintiff was treated worse than similarly situated persons may support an inference of retaliatory motive. See Buttaro, 2017 WL 1906725, at *2 (citing Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)); Tomlins, 812 F. Supp. at 376 n.22; Rolon, 2008 WL 4700705, at *25. In the discrimination context,[6] "[a]n employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Ruiz v. County of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010)

---

[6] In assessing whether Plaintiff adequately pleaded that he was similarly situated to the applicants that were hired instead of him, the court looks to recent Second Circuit case law about disparate-treatment allegations in discrimination cases. The court does this because there is no comparable recent Second Circuit case law about retaliation cases and there is no reason that the pleading standard for a disparate-treatment theory would be different when evaluating a retaliation claim instead of a discrimination claim.

(citation omitted). "Even at the motion to dismiss stage, a court must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." Buttaro, 2017 WL 1906725, at *3 (quoting Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011)).

Plaintiff has not successfully alleged that he and the successful job applicants were similarly situated. He pleaded only one commonality between himself and the other applicants: they were inspectors. (See Am. Compl. ¶¶ 50-73.) He did not plead that the successful job applicants were subject to the same evaluation and discipline standards as him or that they engaged in comparable conduct. See Ruiz, 609 F.3d at 493. He has not even indicated what roles these other individuals served in before applying to the same inspector positions as him. Additionally, he has not explained why his supposedly superior qualifications are applicable to the positions he sought or even provided "any specificity as to the qualifications considered for each position," Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 69 (2d Cir. 2015). Thus, his conclusory assertion that he was more qualified than the successful candidates does not plausibly show that he and the other applicants were similarly situated or support an inference of retaliatory motive. On the contrary, from all that one can tell from the Amended Complaint, it is equally possible that the other applicants were chosen over Plaintiff for "valid, non-discriminatory reasons." See id.

### iii. Pattern of Antagonism

Courts may infer a retaliatory motive from a showing of a "pattern of antagonism" against the plaintiff. Lang v. Town of Tusten, No. 14-CV-4136 (VB), 2015 WL 5460110, at *7 (S.D.N.Y. Aug. 6, 2015) (finding an "ongoing course of adverse action" based, in part, on allegations that the defendant town's building department held the plaintiff's yard sign application to a higher standard because the sign supported fracking); Tomlin, 812 F. Supp. at

20

376 n.22 (finding that a defendant's "pattern of antagonism" toward the plaintiff was circumstantial evidence of retaliatory intent); Hous. Works, Inc. v. City of New York, 72 F. Supp. 2d 402, 426 (S.D.N.Y. 1999) (collecting cases).

Plaintiff's allegations fail to present a sufficiently antagonistic relationship between him and Defendants to support an inference of causation. First, he has not alleged that Defendants antagonized him in any way between his protected speech in 2009 and the job applications that he began submitting in December 2013. (Am. Compl. ¶ 50.) Nor has he alleged that Defendants ever indicated to him that his protected speech might have lasting implications. See, e.g., Mandell v. County of Suffolk, 316 F.3d 368, 384 (2d Cir. 2003) (finding that a lengthy time lapse between protected speech and an adverse action did not preclude causation because the plaintiff alleged that his supervisor warned him of "baggage" from his protected speech).

Second, even if Plaintiff can show a history of antagonism between him and some officials at the SCA—namely, Greenberger—the length of time between his protected activity and the adverse actions he suffered diminishes the relevance of this history. Specifically, as Plaintiff acknowledges, Greenberger left the SCA in 2013. (Am. Compl. ¶ 10.) This means that their allegedly antagonistic relationship cannot support an inference of causation for the adverse actions that occurred after Greenberger left. Nagle, 663 F.3d at 109 ("What can grow stale, over time and distance, is not an expressive act's First Amendment protection but its relevance to the plaintiff's employer." (emphasis omitted)). Plaintiff's allegations about Greenberger's replacement, Grillo, also fail to show a pattern of antagonism. Plaintiff does not specify any interactions he had with her or any reactions she had to his protected conduct. Indeed, Plaintiff does not even allege that Grillo knew about his protected conduct or was at the SCA at the time. See Skates v. Inc. Vill. of Freeport, 265 F. Supp. 3d 222, 237 (E.D.N.Y. 2017) (finding plaintiff

failed to establish causation when he could not show that anyone who took adverse employment action against him, including the individual defendants, were aware of his protected speech). It is possible that others at the SCA held a grudge against Plaintiff and were responsible for the adverse actions he suffered, but he does not allege this.

In sum, Plaintiff has failed to plead a causal connection between his protected speech and any adverse action that he suffered after April 10, 2014. Accordingly, his First Amendment claim must be dismissed.

### C.    Liability of Greenberger and Grillo

Even if Plaintiff's allegations could state a claim of First Amendment retaliation, he would fail to state one against either Greenberger or Grillo. Since the doctrine of respondeat superior does not apply to Section 1983 claims, see Polk County v. Dodson, 454 U.S. 312, 325 (1981), Plaintiff must show that both of the individual defendants had "personal involvement" in the timely retaliatory actions against the Plaintiff. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section 1983]").

Plaintiff has failed to do so here. With respect to Defendant Greenberger, as discussed above, Plaintiff acknowledges that she left the SCA in 2013. (Am. Compl. ¶ 10). Since the court has found that only the adverse actions that Plaintiff suffered after April 10, 2014, are within § 1983's limitation period, Greenberger could not have been involved in the alleged retaliation.

Plaintiff has also failed to show that Defendant Grillo was involved in any of the timely acts of retaliation. While Plaintiff alleges that she was "involved in all employment decisions regarding the Plaintiff after 2013," this is the type of conclusory statement that the court need not

22

accept as true on a motion to dismiss.  See Iqbal, 556 U.S. at 678.  Besides this one conclusory assertion, Plaintiff does not present any other allegations about Grillo.  He does not allege that Grillo was aware of his protected speech, was involved in any of the adverse employment decisions, or that he even knew about these adverse employment decisions.  Therefore, Plaintiff's allegations are insufficient to hold Grillo or Greenberger liable.  See Smith, 776 F.3d at 118 (indicating that, to state a First Amendment retaliation claim, a plaintiff must show that the defendant acted with retaliatory animus).

### D.    Liability of the SCA

Plaintiff also fails to present sufficient allegations to hold the SCA liable under Monell. As a threshold matter, because the court has found that Plaintiff fails to state a claim for First Amendment retaliation, there is no underlying claim to support Monell liability.  See Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").  But even if Plaintiff had stated a claim for First Amendment retaliation, the court finds that Plaintiff has failed to plausibly allege that a policy or custom of retaliation exists at the SCA sufficient to hold the SCA liable under Monell.

### 1.    Legal Framework

To hold a municipal entity liable under Monell, Plaintiff must show that he suffered a constitutional violation as the result of a "policy or custom" at the entity.  436 U.S. at 694.  Since Plaintiff does not allege that there is a written policy of retaliation at the SCA, he must show that there is an unwritten policy or custom that is "so permanent and well settled" that it effectively has force of law.  Id. at 691 (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 167-68 (1970).

23

Plaintiff must also show that there is a "direct causal link" between this policy or custom and the retaliatory action against him. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

A plaintiff can demonstrate the presence of such a policy or custom through a variety of means—two of which are relevant in this case. First, a plaintiff can show that an official who possesses "final policymaking authority" was involved in the decision to harm him. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004). Second, a plaintiff can circumstantially show the presence of an unwritten custom or policy by alleging that the unconstitutional "actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers." See Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988)).

2.    Application

Plaintiff names both Greenberger and Grillo in their official capacities as President and Chief Executive Officer of the SCA. (Am. Compl. ¶¶ 9-10.) This could raise the question of whether they constitute final policymakers whose conduct is sufficient to support Monell liability. But the court does not need to engage with this question because, as discussed above, Plaintiff has failed to show that either of these defendants were personally involved in the timely acts of retaliation. As a result, Plaintiff's Monell claim depends on showing that the retaliatory acts of subordinates at the SCA were widespread enough to support liability.

Plaintiff's allegations fail to meet this standard. He does allege that he has been subject to numerous adverse actions. But courts in this circuit ordinarily find that the experiences of one individual alone cannot support an inference of a "policy or custom." See Prince v. County of Nassau, 837 F. Supp. 2d 71, 104 (E.D.N.Y. 2011) ("The Court declines to find that the alleged harassment—even if undertaken by municipal employees as part of a nefarious plot of revenge—

24

is sufficient to establish Monell liability."), aff'd, 563 F. App'x 13 (2d Cir. 2014); McLaurin v.
New Rochelle Police Officers, 373 F. Supp. 2d 385, 401 (S.D.N.Y. 2005) ("[O]ne man's
experience does not make a policy."), aff'd in part, vacated on other grounds, No. 05-CV-4849,
2007 WL 247728 (2d Cir. Jan. 25, 2007); Birmingham v. Ogden, 70 F. Supp. 2d 353, 373
(S.D.N.Y. 1999) (dismissing municipal liability claims when "the only fair inference here is that
what happened to plaintiff . . . was unique to him—a deeply personal vendetta carried out by
persons who were out to get him."). Here, Plaintiff's allegations—while undoubtedly
distressing—appear to relate only to his own circumstances at the SCA.

Plaintiff's allegations thus fail to show a widespread and persistent policy at SCA of
generally carrying out unconstitutional retaliation against individuals who exercise their First
Amendment right to speak out about unsafe conditions at schools. Cf. Wood v. Town of E.
Hampton, No. 08-CV-4197 (DRH), 2010 WL 3924847, at *24 (E.D.N.Y. Sep. 30, 2010)
("Plaintiff has not alleged . . . that the [defendant] has a custom or practice of allowing its police
officers to harass, falsely arrest and generally carry out vendettas against those with whom they
have personal disagreements." (emphasis added)). While Plaintiff does allege that another
inspector, Sherif Khamel, was reassigned after joining Plaintiff in speaking out against
cooperating with project management, this occurred over five years prior to the timely acts of
retaliation against the Plaintiff. Allegations relating to one other individual, five years prior to
the timely acts of retaliation, are not enough to plead the existence of a policy or custom. See
McLaurin, 373 F. Supp. 2d at 401.

Finally, as discussed above, Plaintiff and Khamel's initial reassignments cannot support
the inference that SCA has a policy or custom of unconstitutional retaliation because the court
has found that their initial reassignments did not violate Plaintiff or Khamel's rights. Plaintiff's

allegations consequently fall short of plausibly alleging the existence of an unwritten policy or custom that is so widespread and established that it can sustain his <u>Monell</u> claim against the SCA.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 22) is GRANTED.  The court DISMISSES Plaintiff's claims without prejudice.

The Clerk of Court is respectfully DIRECTED to enter judgment for Defendants and close this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September 30, 2018

NICHOLAS G. GARAUFIS
United States District Judge